1   STEPTOE & JOHNSON LLP
     Seong Kim (SBN 166604)
2   Dylan Ruga (SBN 235969)
     2121 Avenue of the Stars, Suite 2800
3   Telephone: (310) 734-3200
     Facsimile: (310) 734-3300
4   Email: skim@steptoe.com
     Email: druga@steptoe.com

Attorneys for Univision Communications
Inc. and Galavision, Inc.

7   SIDLEY AUSTIN LLP
     Stephen G. Contopulos (SBN 50317)
8   Carly Steinbaum (SBN 260726)
     555 West Fifth Street, Suite 4000
9   Los Angeles, California 90013-1010
     Telephone: (213) 896-6000
10   Facsimile: (213) 896-6600
     Email: scontopulos@sidley.com
11   Email: csteinbaum@sidley.com

Attorneys for Defendants Xenon Pictures,
Inc. and LionsGate Entertainment, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEAN-JACQUES PERREY, et al., | ) Case No. CV09-6508 FMC (RZx) |
| Plaintiffs, | ) |
| vs. | ) **DEFENDANTS UNIVISION** |
| | ) **COMMUNICATIONS, INC.,** |
| TELEVISA, S.A. DE C.V., et al., | ) **GALAVISION, INC., XENON** |
| | ) **PICTURES, INC. AND LIONSGATE,** |
| Defendants. | ) **ENTERTAINMENT, INC.'S NOTICE** |
| | ) **OF MOTION AND MOTION TO** |
| | ) **DISMISS PURSUANT TO 12(B)(1)** |
| | ) **AND 12(B)(6)** |
| | ) |
| | ) [Declaration of Dylan Ruga filed, and |
| | ) [Proposed] Order lodged, herewith] |
| | ) |
| | ) TIME: 10:00 A.M. |
| | ) DATE: FEBRUARY 1, 2010 |
| | ) PLACE: COURTROOM 750 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on February 1, 2010 at 10.00 a.m. before the Honorable Florence-Marie Cooper, in Courtroom 750 of the United States District Court for the Central District of California, located at the Roybal Building at 225 East Temple Street, Los Angeles, California, Defendants Univision Communications Inc., Galavision Inc., Xenon Pictures, Inc. and LionsGate Entertainment, Inc. (collectively "Defendants") will and hereby do move pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the Complaint filed by Plaintiffs Jean-Jacques Perrey, Gershon Kingsley, Robert Breuer, Anthony Breuer, Frances Breuer, and Sylvain Meunier (collectively "Plaintiffs") on the following grounds:

1.   Plaintiffs cannot demonstrate standing as "beneficial owners" under section 501(b) of the Copyright Act because the musical compositions at issue were works made for hire.

2.   Plaintiffs cannot establish standing to assert their copyright infringement claim because none of them "fixed" the compositions in a "tangible medium of expression."

3.   Plaintiffs do not have standing to pursue their breach of contract claim because they are neither parties to, nor third-party beneficiaries of, the Univision/ASCAP license agreement that allegedly was breached.

This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Dylan Ruga filed concurrently herewith and all exhibits attached thereto, upon all pleadings and other documents on file with this Court, as well as such evidence that the court may properly consider on this motion, and such evidence and argument as may be presented at the time of hearing.

1

1            This motion is made following the conference of counsel pursuant to

2    Local Rule 7-3 which took place on several dates, including but not limited to

3    November 11, 2009.

4    Dated:  November 30, 2009         STEPTOE & JOHNSON LLP

5                                         Seong Kim

6                                         Dylan Ruga

7

8                                    By:   /s/ Dylan Ruga

9                                       Dylan Ruga

10                                      Attorneys for Defendants

11                                      Univision Communications, Inc.

12                                      and Galavision, Inc.

13

14   Dated:  November 30, 2009         SIDLEY AUSTIN LLP

15                                        Stephen G. Contopulos

16                                      Carly S. Steinbaum

17

18                                   By: /s/ Stephen G. Contopulos

19                                      Stephen G. Contopulos

20                                      Attorneys for Defendants

21                                      Xenon Pictures, Inc.

22                                      and LionsGate Entertainment, Inc.

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................. 1

II. STATEMENT OF FACTS ................................................................... 2

    A. The Compositions Were Created In the 1960s ......................... 2

    B. Vanguard Recording Society, Inc. Employed Plaintiffs
       Jean-Jacques Perrey and Gershon Kingsley to Create
       the Compositions ....................................................................... 2

    C. The Compositions Allegedly Have Been Used in Several
       Television Shows That Have Been Broadcast on Television
       and Distributed on DVD Throughout the United States Since the
       Mid-1970's ................................................................................ 5

    D. Based on the Alleged Use of the Compositions in the Shows,
       Plaintiffs Brought Suit Against all the Defendants ................... 6

III. LEGAL STANDARD ........................................................................ 7

    A. Legal Standard for Motion to Dismiss Under Rule 12(b)(1) ... 7

    B. Legal Standard for Motion to Dismiss Under Rule 12(b)(6) ... 7

IV. DISCUSSION ..................................................................................... 8

    A. The Instant Motion Must be Granted Because Plaintiffs
       Are Not and Cannot be Beneficial Owners of the Copyrights
       Allegedly Infringed Because the Compositions Were Works Made
       for Hire ....................................................................................... 8

       1. Plaintiffs' Claims for Copyright Infringement Fail Because
           The Works Were Created as Works Made
           For Hire ........................................................................... 9

           a. The Compositions Were Created at Vanguard's
              Instance ................................................................. 10

           b. Vanguard Had the Ability to Accept, Reject, Modify
              or Otherwise Control the Creation of the
              Compositions ....................................................... 14

i

          c.     The Compositions Were Created at Vanguard's Expense ................................................................15

    2.    The 1966 and 1968 Agreements are Typical Work For Hire Agreements ...................................................16

B.    Plaintiffs Also Lack Standing to Assert Their Copyright Infringement Claims Because None of the Plaintiffs "Fixed" the Compositions in a "Tangible Medium of Expression" ...........................17

    1.    Jean-Jacques Perrey ...................................................19

    2.    Gershon Kingsley .......................................................19

    3.    Fernand Bouillon .......................................................20

    4.    Harry Breuer .............................................................20

C.    Plaintiffs Lack Standing to Assert Their Breach of Contract Claim ......22

V.    CONCLUSION ................................................................25

ii

# TABLE OF AUTHORITIES

**Page(s)**

C**ASES**

*Aalamuhammed v. Lee*,
  202 F.3d 1227 (9th Cir 1999) ................................................................. 13, 17

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
  ___ F. Supp. 2d ___, 2009 WL 2828018 (S.D.N.Y. Sept. 2, 2009)................. 23, 24

*Ashcroft v. Iqbal*,
  129 S.Ct. 1937 (2009)................................................................................. 7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 127 S. Ct. 1955 (2007) ....................................................... 7

*Bella Lewitzky Dance Found.*,
  754 F. Supp. 774 (C.D. Cal. 1991) ........................................................... 7

*Biagro Western Sales, Inc. v. Helena Chemical Co.*,
  160 F. Supp. 2d 1136 (E.D. Cal. 2001) .................................................... 3

*BTE v. Bonnecaze*,
  43 F. Supp. 2d 619 (E.D. La. 1999) ........................................... 18, 19, 20

*Community for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989)................................................................................ 17

*Dolman v. Agee*,
  157 F.3d 708 (9th Cir. 1998) ................................................................... 9

*Donen v. Paramount Pictures Corp.*,
  2008 WL 5054340 (C.D. Cal. Nov. 20, 2008) ..................................... 3, 7

*Erickson v. Trinity Theater, Inc.*,
  13 F.3d 1061 (7th Cir. 1994) ................................................................. 20

*Jones v. Thorne*,
  1999 WL 672222 (D. Or. Aug. 28, 1999) ................................................. 3

*Jorgensen v. United States*,
  2004 WL 3267262 (N.D. Cal. 2004) ......................................................... 3

iii

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) ......................................................................... 3

*Martha Graham Sch. and Dance Found., Inc. v. Martha Graham Center of*
    *Contemp. Dance, Inc.*,
    380 F.3d 624 (2d Cir. 2004) ............................................. 10, 12, 13, 14

*McCarthy v. United States*,
    850 F.2d 558 (9th Cir 1988) ....................................................................... 3

*Monahan v. Pena*,
    2009 WL 2579085 (E.D.N.Y. Aug. 18, 2009) ...................................... 24

*Newton v. Diamond*,
    204 F. Supp. 2d 1244 (C.D. Cal. 2002) ........................................ passim

*North Star Int'l v. Arizona Corp. Comm'n*,
    720 F.2d 578 (9th Cir. 1983) ....................................................................... 7

*Playboy Enterprises, Inc. v. Dumas*,
    53 F.3d 549 (2d Cir. 1995) ........................................................................ 14

*Siegel v. Warner Bros. Ent'mt Inc.*,
    2009 WL 2512842 (C.D. Cal., Aug. 12, 2009) (Larson, J.) ............ passim

*SOS, Inc. v. Payday, Inc.*,
    886 F.2d 1081 (9th Cir. 1989) ....................................... 19, 20, 22

*Twentieth Century Fox Film Corp. v. Dastar Corp.*,
    2000 WL 35503105 (C.D. Cal., Jan. 4, 2000) ...................................... 9,

*Twentieth Century Fox Film Corp. v. Entertainment Distributing*
    429 F.3d 869 (9th Cir. 2005) .......................................................... passim

*Twin Books Corp. v. Walt Disney Co.*,
    83 F.3d 1162 (9th Cir. 1996) .................................................................... 18

*Warren v. Fox Family (Warren I)*,
    171 F. Supp. 2d 1057 (C.D. Cal. 2001) .......................................... 3, 7

*Warren v. Fox Family Worldwide, Inc. (Warren II)*,
    328 F.3d 1136 (9th Cir. 2003) ................................................ 3, 7, 8, 9

iv

STATUTES

17 U.S.C. § 101 ................................................................................................. 1

17 U.S.C. § 102(a) ........................................................................................... 17

17 U.S.C. § 102(a)(2) ........................................................................................ 6

17 U.S.C. § 501(b) .............................................................................. 1, 6, 8, 9

Cal. Civ. Code § 1559 ...................................................................................... 23

Copyright Act of 1976 ....................................................................................... 9

Copyright Act of 1909 ................................................................................ passim

RULES

F.R.C.P. Rule 12 ................................................................................................ 3

F.R.C.P. Rule 12(b)(1) .................................................................................. 3, 7

F.R.C.P. Rule 12(b)(6) ...................................................................................... 7

F.R.C.P. Rule 56 ................................................................................................ 3

TREATISES

Nimmer on Copyrights § 30.02 .................................................................. 16, 17

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This case is an attempt by several musicians and their heirs to seek damages for the alleged use of copyrights they do not own and for which they have no rights of recovery.  Specifically, Plaintiffs have asserted claims for copyright infringement, breach of contract and "violation of moral rights" under Mexican law as a result of the alleged use of three musical compositions, "Baroque Hoedown," "An Elephant Never Forgets," and "Country Rock Polka" (collectively, the "Compositions"), in three Spanish language television series.

Plaintiffs, however, do not have standing to assert these copyright or contract claims.  To have standing to initiate a claim for copyright infringement, a plaintiff must be either the legal or beneficial owner of the copyright.  17 U.S.C. § 501(b).  Plaintiffs here admit they are not the legal owners of the copyrights in the Compositions but claim to be "beneficial owners" with independent standing to bring suit under section 501(b) of the Copyright Act ("Section 501(b)").

Plaintiffs are mistaken.  As Plaintiffs admit, the Composition were created at the "instance and expense" of Vanguard Recording Society, Inc. ("Vanguard"), and thus are "works made for hire" under the Copyright Act of 1909.  Accordingly, under clear Ninth Circuit authority, Plaintiffs are not beneficial owners and have no standing to sue for infringement.

Even assuming *arguendo* that the Compositions were not works made for hire, Plaintiffs still do not have standing to assert copyright infringement of the Compositions because none of the Plaintiffs "fixed" the Compositions in a "tangible medium of expression," as required by 17 U.S.C. § 101.

Plaintiffs also lack standing to assert their breach of contract claim, asserted against Univision and Galavision only, because Plaintiffs are neither parties to, nor third-party beneficiaries of, the ASCAP/Univision license agreement that

1

1   allegedly was breached.[1]

2   **II.    STATEMENT OF FACTS**

3       **A.    The Compositions Were Created In the 1960s**

4           According to the Complaint, Plaintiffs are the creators and composers (or

5   their heirs) of three musical compositions that were created in the 1960s.  *See* Compl.

6   ¶¶ 17-19.  Specifically, plaintiffs Jean-Jacques Perrey and Gershon Kingsley are

7   alleged to have "created and composed the original musical composition 'Baroque

8   Hoedown,'" (Compl. ¶ 17), plaintiff Jean-Jacques Perrey, Gary Bratman (aka Gary

9   Carroll)[2] and the late Harry Breuer are alleged to have "created and composed the

10  original musical composition 'An Elephant Never Forgets,'" (Compl. ¶ 18), and

11  plaintiff Jean-Jacques Perrey, the late Harry Breuer, and the late Fernand Bouillon are

12  alleged to have "created and composed the original musical composition 'Country

13  Rock Polka'" (Compl. ¶ 19).  Plaintiffs Robert Breuer, Anthony Breuer, and Frances

14  Breuer are alleged to be heirs of the late Harry Breuer, and Sylvain Meunier is alleged

15  to be the heir of the late Fernand Bouillon.  Compl. ¶ 21.

16      **B.    Vanguard Recording Society, Inc. Employed Plaintiffs Jean-Jacques**

17            **Perrey and Gershon Kingsley to Create the Compositions**

18          The Compositions were created under two contracts that Perrey and

19  Kingsley signed with Vanguard.[3]  Plaintiffs concede that Perrey and Kingsley

20  "entered into agreements with Vanguard" in the "late 1960s."  *See* Compl. ¶ 23.

21

22  _____

23  [1] The Court need not decide this issue if it concludes that Plaintiffs do not have standing to assert their copyright infringement claims because the only claim supporting federal court jurisdiction will have been dismissed.

24

25  [2] Neither Gary Bratman nor his heirs are a party to this suit.

26  [3]  Kingsley previously had worked for Vanguard on various occasions and had represented to the public that he was a staff arranger for Vanguard.  *See, e.g.*, Ruga Decl. Ex. 3 (Kingsley Dep.) at 312:

27  14-16 ("Q. So, you worked with Vanguard from 1963 which was your first project to about when? A. Maybe '67 or '68.").  Indeed, Vanguard's own liner notes included in the CD for the 2001 re-

28  release of Perrey & Kingsley's first album confirms that "Gershon Kingsley became a staff arranger at Vanguard Records."  Ex. 11 at p. 2.

1    Those "agreements" refer to two contracts, under which each Composition was

2    created:  (1) a contract dated March 1, 1966 between Vanguard Recording Society,

3    Inc., on the one hand, and plaintiffs Jean-Jacques Perrey and Gershon Kingsley, on the

4    other (the "1966 Agreement"); and (2) a contract dated March 22, 1968 between

5    Vanguard Recording Society, on the one hand, and plaintiff Jean-Jacques Perrey, on

6    the other (the "1968 Agreement") (collectively "Agreements").  True and correct

7    copies of the 1966 Agreement and the 1968 Agreement[4] are attached as Exhibits 1 and

8    2, respectively, to the Declaration of Dylan Ruga ("Ruga Decl.") filed herewith.[5]

9         Under the 1966 Agreement, Vanguard employed both Perrey and

10   Kingsley for the purpose of composing songs and making records exclusively for

11   Vanguard.  *See* Ruga. Decl. Ex. 3 (Kingsley Dep.) at 372:6-16; Ruga Decl. Ex. 5

12   (Perrey Dep.) at 51:23-52:10.[6]  The contract specifically states: "We hereby agree to

---

14   [4] The Court can consider these contracts in deciding the motion to dismiss.  As noted in the next
15   Section, on a motion to dismiss under Rule 12(b)(1), the court may consider extrinsic evidence to
     determine standing.  *See, e.g.*, *Warren v. Fox Family Worldwide, Inc. (Warren II)*, 328 F.3d 1136,
16   11341-42 (9th Cir. 2003).  Additionally, while a court must generally refrain from considering
     extrinsic evidence on a motion to dismiss, it may rely on documents on which the complaint
17   'necessarily relies' and whose 'authenticity… is not contested.'"  *Id.* at 1141 n.5 (citing *Lee v. City
     of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  In *Warren*, the court found that consideration of
18   agreements not attached to the complaint was necessary to decide whether the plaintiff was a legal or
     beneficial owner of the copyrights.  *Warren II*, 328 F.3d at 1141 n.5; *See also Warren* I, 171 F.
19   Supp. 2d at 1063 ("The contracts proffered by defendants are relevant in assessing whether Warren
     is a legal or beneficial owner of the copyrights at issue.  For this reason, so long as they do not raise
20   factual issues going to the merits of the case, they are properly considered in deciding defendants'
     Rule 12(b)(1) motion."); *Donen*, 2008 WL 5054340, at *2-3 (extrinsic contract properly considered
21   in deciding standing to pursue copyright infringement claim).  The court can also properly consider a
     declaration.  *See, e.g.*, *Jorgensen v. United States*, 2004 WL 3267262, at *7 (N.D. Cal. 2004) (stating
22   that the court "may consider a declaration on a 12(b)(1) motion to dismiss).

24   [5] **All future citations to exhibits refer to exhibits attached to the Declaration of Dylan Ruga.**

25   [6] On a 12(b)(1) motion challenging standing, the Court may properly consider deposition testimony
26   without converting the Rule 12 motion into a Rule 56 motion for summary judgment. *See, e.g.*,
     *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir 1988) ("when considering a motion to
27   dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but
     may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning
28   the existence of jurisdiction"); *Warren I*, 171 F. Supp. 2d at 1063 (stating same); *Biagro Western
     Sales, Inc. v. Helena Chemical Co*., 160 F. Supp. 2d 1136, 11443 (E.D. Cal. 2001) (considering
     deposition on defendant's motion to dismiss); *Jones v. Thorne*, 1999 WL 672222, at *6-7 (D. Or.

                                                                   *(Footnote continued)*

DEFENDANTS' NOTICE OF MOTION
AND MOTION TO DISMISS
Doc. # CC-217007 v.1

employ your personal services as a composer-arranger and recording artist for the purpose of making phonograph records and you hereby agree to record solely and exclusively for us according to the terms and provisions of this agreement." Ex. 1 ¶ 1. The Agreement made clear that Kingsley and Perrey were to furnish Vanguard with original compositions. Ex. 1 ¶ 16 ("You will furnish us with original compositions.").

Vanguard reserved the right under the 1966 Agreement to approve, reject, or modify the recordings. Ex. 1 ¶ 2 ("The musical compositions to be recorded shall be mutually agreed upon between you and us, and each recording shall be subject to our approval as satisfactory for manufacture and sale."); *id.* ¶ 2 ("We shall have the right to call upon you to repeat any work until a satisfactory master recording has been made."); *see also, e.g.*, Ex. 3 (Kingsley Dep.) at 192: 9-14; Ex. 5 (Perrey Dep.) at 70: 9-14 ("Q.   You understood that Vanguard had the right to reject a particular composition if they thought it was not proper for the album, right? [objection]  A. Yes, if they wanted to.").

Vanguard also bore the financial risk of the albums created under the 1966 Agreement.  *See*  Ex. 1, ¶¶4, 17 (discussing nonreturnable payment to Mr. Perrey and royalties to Perrey and Kingsley); s*ee also, e.g.*, Ex. 3 (Kingsley Dep.) at 206: 6-10 (explaining that Vanguard paid for all of the albums' costs) & 207:2-7 (explaining that Vanguard took the financial risk); Ex. 5 (Perrey Dep.) at 36: 24-37:7 ("Q. So in that sense Vanguard took the financial risk for the event that if the albums were not successful correct? [objection] A. Yes, because they signed a contract.").

The 1968 Agreement, signed just between Perrey and Vanguard, was substantially the same.  Indeed, Mr. Perrey testified at his deposition that, as with the 1966 Agreement, his job under the 1968 Agreement was *both* to compose songs and to record them. Ex. 5 (Perrey Dep.) at 90: 20-91:3 ("Q. According to this [1968]

---

Aug. 28, 1999) (considering deposition testimony to determine whether plaintiff had standing).  The deposition of Gershon Kingsley is attached as Exhibit 3 to the Declaration of Dylan Ruga ("Ruga Decl.") and volumes 1, 2, and 3 of the deposition of Jean-Jacques Perrey are attached to the Declaration as Exhibits 4, 5, and 6, respectively.

contract, part of the work that Vanguard was paying you to do is for you to use your creativity and originality to compose the songs that would go into albums three and four in addition to recording it, right? [objection] A. Yes.").   Indeed, the remaining language of the 1968 Agreement confirms that Perrey was hired to create compositions as well as sound recordings.  *See, e.g.*, Ex. 2 ¶ 22 ("it is agreed that all musical compositions recorded hereunder shall be original compositions, written, in whole or in part by you, and you do further agree to cause 100% of the world-wide copyright thereof to be fully assigned to Fennario Music Publishers"); *id.* ¶ 24 ("You will furnish us with original compositions.").

Vanguard also reserved the right to accept, modify, or reject the Compositions created under the 1968 Agreement.  Ex. 2 ¶ 2 ("The musical compositions to be recorded shall be subject to our approval as satisfactory for manufacture and sale."); *id* ¶ 2 ("We shall have the right to call upon you to repeat any work until a satisfactory master recording has been made.").

Additionally, like the 1966 Agreement, Vanguard bore the financial risk under the 1968 contract as well.  *See* Ex. 2 ¶¶3, 26 (discussing nonreturnable payment to Perrey and royalties); Ex. 5 (Perrey Dep.) at 69: 4-17 (explaining that Vanguard paid for all the artists and all the expenses under the 1968 Agreement).

**C.**     **The Compositions Allegedly Have Been Used in Several Television Shows That Have Been Broadcast on Television and Distributed on DVD Throughout the United States Since the Mid-1970's**

Three Spanish-language television shows – "Chavo Del 8," "El Chapulin Colorado,"  and "Chespirito" (collectively, "the Shows") – are at issue in this action. *See, e.g.*,  Compl. ¶ 24.  Since the mid-1970s, Televisa is alleged to have reproduced, copied and/or otherwise synchronized these recorded Compositions and their sound recordings in episodes of the Shows.  *See* Compl. ¶  24.  Specifically, Plaintiffs allege that "An Elephant Never Forgets'" was used in the series "Chavo Del 8," (Compl. ¶ 24(a)), "Baroque Hoedown" was used in the series "El Chapulin Colorado," (Compl. ¶

1   24(b)), and "Country Rock Polka" was used in the series "Chespirito." (Compl.

2   ¶24(c)).  Plaintiffs allege that Televisa entered into licensing agreements with

3   defendants Univision, Galavision and Xenon to "reproduce, copy, perform and

4   distribute" episodes of the Shows containing the Compositions (Compl.  ¶ 25) and that

5   Defendants all have been involved with reproducing, copying, synchronizing, and

6   distributing the Shows containing the Compositions in some capacity for "many

7   years" (Compl. ¶ 26).[7]

8         D.    **Based on the Alleged Use of the Compositions in the Shows, Plaintiffs**

9               **Brought Suit Against all the Defendants**

10              Based on the alleged use of the Compositions in the Shows, Plaintiffs

11   brought suit on September 8, 2009 (the "Complaint"), seeking recovery for copyright

12   infringement, breach of contract, and "violation of moral rights" under Mexican law.

13   Plaintiffs are not initiating suit for use of the *sound recordings* for these works and are

14   only claiming copyright infringement for the use of the *underlying musical*

15   *compositions*.  *See, e.g.*, Compl. ¶¶ 20, 22 (noting the "copyrights in the

16   Compositions"); *id.* ¶ 23 (distinguishing the Compositions and "sound recordings

17   embodying performances of the Compositions"); 17 U.S.C. § 102(a)(2); *Newton v.*

18   *Diamond*, 204, F. Supp. 2d 1244, 1248-49 (C.D. Cal. 2002) ("Sound recordings and

19   their underlying musical compositions are separate works with their own distinct

20   copyrights.").  To support their allegation of copyright infringement, Plaintiffs claim

21   to be "beneficial owners" of the copyrights in the Compositions with standing to sue

22   under 17 U.S.C. § 501(b).  *See* Compl. ¶ 23.  The gravamen of Plaintiffs' breach of

23   contract claim is that Univision allegedly breached the ASCAP/Univision license

24   agreement by failing to provide accurate cue sheets to ASCAP.

25

26   [7] Despite the widespread distribution of the allegedly infringing shows for approximately three
     decades, Plaintiffs just recently filed their Complaint.  Plaintiff Jean-Jacques Perrey testified at his

27   deposition that it was "unreasonable" for his personal manager to not have discovered the alleged
     infringement sooner, particularly because several popular websites (including Amazon.com,

28   Wikipedia, and Perrey's own guestbook on his personal website) stated that the Compositions were
     being used as theme songs in the television shows at issues.  Ex. 5 (Perrey Dep.) at 121:16-122:5.

6

# III.   LEGAL STANDARD

## A.   Legal Standard for Motion to Dismiss Under Rule 12(b)(1)

A complaint may be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.  *See, e.g., Warren v. Fox Family Worldwide, Inc. (Warren II)*, 328 F.3d 1136, 1139-40 (9th Cir. 2003); *Donen v. Paramount Pictures Corp.*, 2008 WL 5054340, at *1 (C.D. Cal. Nov. 20, 2008). Motions to dismiss for lack of standing are properly considered under Rule 12(b)(1). *See, e.g., Warren II*, 328 F.3d at 1140; *Bella Lewitzky Dance Found.*, 754 F. Supp. 774, 778 (C.D. Cal. 1991) (noting that standing is considered "a defect in the court's subject matter jurisdiction"); *Warren v. Fox Family (Warren I)*, 171 F. Supp. 2d 1057, 1065 (C.D. Cal. 2001) ("Standing is a jurisdictional requirement, and the court must dismiss an action for lack of subject matter jurisdiction if it determines that plaintiff lacks standing to assert a claim").  It is the plaintiff's burden of establishing that the facts alleged, if proved, would establish standing.  *See Warren II*, 328 F.3d at 1140. Further, when considering a Rule 12(b)(1) motion, the Court may look beyond the complaint and consider extrinsic evidence.  *See Warren II*, 328 F.3d at 1141 n.5 ("in ruling on a 12(b)(1) jurisdictional challenge, a court may look beyond the complaint and consider extrinsic evidence"); *Donen*, 2008 WL 5054340, at *2.

## B.   Legal Standard for Motion to Dismiss Under Rule 12(b)(6)

A motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of the Complaint.  *North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Dismissal of a complaint at the pleading stage is appropriate where, accepting the allegations as true, the complaint fails to allege the essential elements of a claim or discloses a defect in a claim.  *See Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007).  A complaint must "state a claim to relief that is plausible on its face," not simply one that is "speculative," "conceivable" or "possible."  *Twombly*, 127 S. Ct. at 1965, 1969, 1974.

1    **IV.    DISCUSSION**

2        **A.    The Instant Motion Must be Granted Because Plaintiffs Are Not and**

3            **Cannot be Beneficial Owners of the Copyrights Allegedly Infringed**

4            **Because the Compositions Were Works Made for Hire**

5            To recover for copyright infringement, a plaintiff must establish

6    ownership of the copyrights. *See, e.g.*, *Twentieth Century Fox Film Corp. v.*

7    *Entertainment Distributing.,* 429 F.3d 869, 876 (9th Cir. 2005).  Plaintiffs here admit

8    that they are *not* the legal owners of the copyrights in the Compositions but assert that

9    they have standing to sue for copyright infringement as "beneficial owners."  17

10   U.S.C. § 501(b) ("The legal or beneficial owner of an exclusive right under a

11   copyright is entitled . . . to institute an action for any infringement of that particular

12   right committed while he or she is the owner of it.").  Plaintiffs' only argument in

13   support of their allegation of beneficial ownership is that they receive royalties in

14   connection with the use of the Compositions. *See, e.g.*, Compl. ¶ 23.  This argument,

15   however, is inconsistent with established Ninth Circuit authority. *Warren II*, 328 F.3d

16   at 1144-45.

17           The law is clear that a party *cannot be* a beneficial owner if the work at

18   issue was created as a "work made for hire," regardless of whether the party

19   subsequently received royalties. *Id*. ("We therefore hold that because the Act does not

20   envision a work-for-hire arrangement as an 'assignment,' but rather provides for

21   *initial vesting* of all rights of authorship in the person for whom the work was

22   prepared, a grant of royalties to a creator of a work for hire, absent an express

23   contractual provision to the contrary, does not create a beneficial ownership interest in

24   that creator.") (emphasis in original).  In short, a composer who created a work as a

25   "work made for hire" cannot be either a legal or beneficial owner as a matter of law,

26   and thus necessarily lacks standing to pursue claims for infringement under the

27

28

1   Copyright Act.  *See id.*[8]

2           Here, despite their alleged right to receive royalties in connection with

3   the use of the Compositions, Plaintiffs cannot establish beneficial ownership because,

4   as explained below, the Compositions were "works made for hire" for Vanguard.  As

5   there is no express contractual provision stating otherwise, no ownership interests ever

6   vested in Plaintiffs.  *Warren II*, 328 F.3d at 1144-45.  Plaintiffs, therefore, lack

7   standing under section 501(b) to pursue their copyright infringement claims.

8           **1.      Plaintiffs' Claims for Copyright Infringement Fail Because**

9                      **The Works Were Created as Works Made For Hire**

10          The 1909 Copyright Act, rather than the 1976 Act, controls whether the

11  Compositions were created as works made for hire because it is undisputed that each

12  of the Compositions was created and published prior to January 1, 1978, the effective

13  date of the 1976 Act.  *Dolman v. Agee,* 157 F.3d 708, 712 n.1 (9th Cir. 1998) ("The

14  1909 Act is the applicable law in cases in which creation and publication of a work

15  occurred before January 1, 1978, the effective date of the 1976 Act.").

16          Under the 1909 Copyright Act, a presumption arises that a work is made

17  for hire if it was created at the "instance and expense" of the hiring party.  *Twentieth*

18  *Century Fox Film Corp. v. Entertainment Distributing*, 429 F.3d 869, 877 (9th Cir.

19  2005) ("[W]e have consistently evaluated claims that a work was made for hire by

20  asking whether it was created at the 'instance and expense' of the engaging party.");

21  *Dolman*, 157 F.3d at 712; *Twentieth Century Fox Film Corp. v. Dastar Corp.*, 2000

22  WL 35503105, at *9 (C.D. Cal., Jan. 4, 2000) (Cooper, J.) ("Under the 1909

23  Copyright Act, proprietorship of a work made for hire belongs to the person at whose

24

25  ───────────────

26  [8] Moreover, there is no evidence that Breuer and Bouillon even received royalties for their alleged contribution to the Composition.  *See, e.g.*, Ex. 6 (Perrey Dep.) at 26:3-8 ("Q. Do you  know if anyone at Vanguard paid Mr. Bouillon royalties that are described in ]the 1968 agreement]…A.  I don't know but I don't think so.").  Nor were they paid for their work. *See, e.g., id.* at 25:5-8 ("Q. Did

27  Vanguard pay [Mr. Bouillon] any money?...A. No."); Ex. 5 (Perrey Dep.) at 98:23-99:4 ("Q. But Vanguard paid Harry Breuer, "yes" or "no"? [objection] A. They didn't. They didn't pay him for

28  that.").  Thus, their claims of ownership are even more attenuated.

1    'instance' and 'expense' it was created.").

2              The "instance and expense test" requires evaluation of three factors: (1)

3    at whose instance was the work prepared; (2) whether the hiring party had the power

4    to accept, reject, modify or otherwise control the creation of the work; and (3) at

5    whose expense the work was created.  *Siegel v. Warner Bros. Ent'mt Inc.*, 2009 WL

6    2512842, at *16 (C.D. Cal., Aug. 12, 2009) (Larson, J.) (citing *Entertainment*

7    *Distributing*, 429 F.3d at 879, 881).

8                        **a.    The Compositions Were Created at Vanguard's Instance**

9              A work is created at the instance of the commissioning party if it was that

10   party who "induced the creation."  *Entm't Distrib.*, 429 F.3d at 779.  The instance test

11   does not examine whether the work would have been created but-for the artist's

12   employment; rather, the test focuses on the nature and scope of the  parties' business

13   relationship.  *Siegel*, 2009 WL 2512842, at *17.  As explained by the Second Circuit:

14                   No doubt Graham was a self-motivator, and perhaps she
15                   would have choreographed her dances without the salary of
16                   Artistic Director, without the Center's support and
                     encouragement, and without the existence of the Center at
17                   all, but all that is beside the point. *The fact is that the Center*
18                   *did employ her to do the work, and she did the work in the*
                     *course of her regular employment with the Center.* Where an
19                   artist has entered into an explicit employment agreement to
20                   create works, works that she creates under that agreement
                     cannot be exempted from the work-for-hire doctrine on
21                   speculation about what she would have accomplished if she
22                   had not been so employed.

23   *Martha Graham Sch. and Dance Found., Inc. v. Martha Graham Center of Contemp.*

24   *Dance, Inc.*, 380 F.3d 624, 640 (2d Cir. 2004) (emphasis added).

25             Courts generally resolve the instance test by looking at whether the

26   author began creating the work before or after signing an agreement with the

27   commissioning party.  Where the work did not begin until *after* the parties'

28   relationship, it generally is deemed to have been created at the instance of the hiring

     party.  *Entm't Distrib.*, 429 F.3d at 779 (concluding that the instance test was satisfied

                                          10

because General Eisenhower "did not begin actual writing until after" he was hired by Doubleday); *Martha Graham,* 380 F.3d at 639-40; *Siegel*, 2009 WL 2512842, at *26

("It is clear to the Court that all of the *comic book* material produced by Siegel and Shuster *after* they signed the employment agreement with Detective Comics were works made for hire [under the 1909 Copyright Act].") (emphasis in original).

Here, it is undisputed that the composition for "Baroque Hoedown" was created at Vanguard's instance. The plain language of the 1966 Agreement makes clear that Vanguard hired Plaintiffs for the express purpose of composing and recording albums exclusively for Vanguard. *See* Ex. 1 ¶ 1("We hereby agree to employ your personal services as a composer-arranger and recording artist for the purpose of making phonograph records and you hereby agree to record solely and exclusively for us according to the terms and provisions of this agreement.").

Indeed, Mr. Kingsley and Mr. Perrey both admitted at their depositions that Vanguard hired them specifically to create these albums. Ex. 3 (Kinglsey Dep.) at 372:12-16 ("Q. And that's because Vanguard had paid you and hired you to create those two albums; correct? [objection] A. Yes."); Ex. 4 (Perrey Dep.) at 118:25-119:4 ("Q. [I]n fact there [were] two albums that [were] produced under the terms of this exhibit number 12, 1966 agreement, correct? A. Yes."). Significantly, as Plaintiffs admit, Baroque Hoedown was on the second album created by plaintiffs Perrey and Kingsley under the 1966 Agreement. Ex. 3 (Kingsley Dep.) at 142: 12-14. The second album was created in 1967[9]— a year after the Agreement was signed and the first album was released—and was created only because the first album was a success, and Vanguard's president specifically requested that Perrey and Kingsley make a second album under the contract. Ex. 3 (Kingsley Dep. ) at 158: 14-17 & 344: 14-17. None of the compositions for the second album, including the composition for "Baroque Hoedown," was created until *after* the first album was released. Ex. 3

---

[9] Ex. 3 (Kingsley Dep.) at 339:10-340:22.

1   (Kingsley Dep.) at 143: 10-19 (Q. "Certainly none of the songs on the second album

2   had been created by the time that the first album was released? A. No. Q. 'No'

3   meaning I'm correct; right? A. Yeah.").  Accordingly, *Messrs. Perrey and Kingsley*

4   *began working on "Baroque Hoedown" only because Vanguard's president requested*

5   *that they produce a second album under their contract*.  It follows that the

6   composition for "Baroque Hoedown" was created at Vanguard's instance.  *See Entm't*

7   *Distrib.*, 429 F.3d at 779; *Martha Graham*, 380 F.3d at 639-40; *Siegel*, 2009 WL

8   2512842 at *26.

9          The compositions for "An Elephant Never Forgets" and "Country Rock

10   Polka," which were created by Perrey under the 1968 Agreement, similarly were

11   created at Vanguard's instance.  The 1968 Agreement was signed at Vanguard's

12   request because Messrs. Perrey and Kingsley had a falling out after creating their

13   second album together under the 1966 Agreement.  Ex. 4 (Perrey Dep.) at 90:22-91:2

14   ("Q. And why did you not record the third album [with Mr. Kingsley]? A. Because I

15   had a very violent argument with Mr. Kingsley and I decided to stop our plan to make

16   three records.) & 91: 24-92:7 ("Q. [W]hat if anything did Mr. Solomon [at Vanguard]

17   say to you in terms of holding you to the requirement for three albums under Exhibit

18   12?  A.  He said he understood me very well, that he was a bit doubtful about it but

19   that it was not of any importance because I would sign a contract, an *exclusivity*

20   contract with him, with me alone.") (emphasis added).  Vanguard specifically

21   requested that Mr. Perrey create another two albums (without Mr. Kingsley) under a

22   new agreement.  *See* Ex. 5 (Perrey Dep.) at 68:5-69:3.

23          Mr. Perrey testified at his deposition that the 1968 Agreement in effect

24   was the same as the 1966 Agreement; in both instances, Vanguard hired him to

25   compose songs and perform the sound recordings.  Ex. 5 (Perrey Dep.) at 90:20-91:3

26   ("Q. According to this [1968] contract, part of the work that Vanguard was paying you

27   to do is for you to use your creativity and originality to compose the songs that would

28

1   go into albums three and four in addition to recording it, right? [objection] A. Yes.").[10]

2   None of the compositions on the albums created by Mr. Perrey under the 1968

3   Agreement was composed until *after* the agreement was signed.  *See, e.g.*, Ex. 4

4   (Perrey Dep.) at 121: 3-21.  It follows that the compositions for "An Elephant Never

5   Forgets" and "Country Rock Polka" were created at Vanguard's instance.  *See Entm't*

6   *Distrib.*, 429 F.3d at 779; *Martha Graham*, 380 F.3d at 639-40; *Siegel*, 2009 WL

7   2512842 at *26.

8          In short, Messrs. Perrey and Kingsley were hired by Vanguard to

9   create the Compositions and that is exactly what they did.[11]  None of the

10  Compositions was created until *after* the contracts were signed, and each was created

11  at Vanguard's instance.  It follows that this prong of the "instance and expense" test is

12  satisfied.  *See, e.g.*, *Siegel*, 2009 WL 2512842, at *26 (finding "instance" test satisfied

13  where the agreement "makes plain that the pair were specifically employ[ed] and

14  retain[ed]" for the purpose of producing "on an ongoing basis, the comic book

15

16  [10] While the language of the 1968 Agreement just refers to employing Perrey as a "recording artist
    for the purpose of making phonographic records," (Ex. 2 ¶1), it is clear from the rest of the
17  Agreement that the Agreement was for compositions as well.  *See, e.g.*, *id* ¶ 22 ("it is agreed that all
18  musical compositions recorded hereunder shall be original compositions, written, in whole or in part
    by you, and you do further agree to cause 100% of the world-wide copyright thereof to be fully
19  assigned to Fennario Music Publishers"); *id.* ¶ 24 ("You will furnish us with original
    compositions.").  The reason for the change is that Perrey is incapable of physically transcribing the
20  compositions onto paper because he does not read or write music. *See ,e.g.*, Ex. 5 (Perrey Dep.) at
    84:5-7 ("Q. Now, you told me before that you cannot write down music, right? A. Yes, that is the
21  problem."); Ex. 6 (Perrey Dep.) at 56:9 ("I am incapable of reading music.").  Even *Mr. Perrey
22  admitted that he was hired under both the 1966 and 1968 agreements to compose music for
    Vanguard.  See Ex. 5 (Perrey Dep.) at 90:20-91:3.*
23
    [11] Nor can the alleged contribution of Breuer and Bouillon alter the finding of work made for hire.
24  As discussed in part B *infra*, Breuer and Bouillon worked under Perrey's control.  *See, e.g.*, Ex. 6
    (Perrey Dep.) at 26:9-17 (discussing Mr. Bouillon's assistance to Perrey as a  "personal matter"
25  between the men that did not involve Vanguard); Ex. 6 (Perrey Dep.) at 46:3-7 (discussing Mr.
    Breuer's voluntary assistance).  It would be illogical to find that Vanguard intended to share
26  ownership of Country Rock Polka and An Elephant Never Forgets with Perrey's friends who merely
    assisted him with the Compositions' creation.  *See, e.g.*, *Aalamuhammed v. Lee*, 202 F.3d 1227,
27  1235 (9th Cir 1999) (explaining that "[i]t would be illogical to conclude that Warner Brothers, while
    not wanting to permit Lee to own the copyright, intended to share ownership with individuals like
28  Aalamuhammed who worked under Lee's control.").

1   magazines for certain characters").

2   **b.  Vanguard Had the Ability to Accept, Reject, Modify or**

3   **Otherwise Control the Creation of the Compositions**

4   The second prong of the "instance and expense test" examines whether

5   the hiring party had the ability to accept, reject, modify, or otherwise control the

6   creation of the work.  *Entm't Distrib.*, 429 F.3d at 880; *Playboy Enterprises, Inc. v.*

7   *Dumas*, 53 F.3d 549, 554 (2d Cir. 1995) (explaining that the "instance" test was

8   satisfied where the commissioning party had the power to "accept, reject or modify"

9   the author's work); *Siegel*, 2009 WL 2512842, at *18 ("Although it is not critical that

10   the commissioning party actually exercise its right of control and supervision in the

11   creation of the work in question, it is necessary that the party *have* the right to direct,

12   control, or otherwise shape the artist's work.").

13   Here, Vanguard specifically reserved the right to accept, reject and

14   otherwise control Plaintiffs' work in connection with the Compositions.  Ex. 1 ¶ 2

15   (requiring that Vanguard approve compositions); Ex. 2 ¶ 2 (same).

16   Additionally, both Perrey and Kingsley admitted in their depositions that

17   Vanguard had the right to approve and reject each of the Compositions.  *See* Ex. 3

18   (Kingsley Dep.) at 192: 9-14 ("Q. And did Vanguard have the right to tell you, you

19   know, this song, we don't think it's commercially viable, so we're not going to

20   include that in the album? [objection] A. Yes."); Ex. 5 (Perrey Dep.) at 70:9-15

21   (same).[12]  In light of the foregoing, Vanguard clearly had the ability to accept, reject

22   and otherwise control Messrs. Perrey and Kingsley's work; it is immaterial whether

23   Vanguard ever exercised that right.  *Siegel*, 2009 WL 2512842, at *26 ("Complete

24   control over the author's work is not necessary to meet the instance test, all that is

25   required is the right to direct and supervise the manner in which the work is created,

26   and even then, the *right* to direct and supervise need never be exercised.") (internal

27

28

---

[12] Perrey also confirmed in his deposition that Vanguard reserved the right to ask Kingsley and Perrey to modify the instrumentals if it found appropriate to do so. Ex. 6 (Perrey Dep.) at 35:7-14.

14

1  quotation marks and citations omitted) (emphasis in original); *Entm't Distrib.*, 429

2  F.3d at 880; *Martha Graham*, 380 F.3d at 635.  This prong of the "instance and

3  expense test" is satisfied.

4          **c.**    **The Compositions Were Created at Vanguard's Expense**

5          To determine whether a work was created at the commissioning party's

6  expense, the Court should evaluate which party assumed the economic risk of the

7  work's profitability.  *Entm't Distrib.*, 429 F.3d at 881 ("[T]here is little doubt that the

8  book was authored at [the publisher's] expense.  [The publisher] took on all the

9  financial risk of the book's success, agreeing to pay [the writer] a lump sum for

10 writing the book, instead of negotiating a royalty deal."); *Siegel*, 2009 WL 2512842,

11 at *17 (explaining that, under the "expense" element of the work made for hire test,

12 "the focus is on who bore the *risk* of the work's profitability") (emphasis in original).

13         Here, both Perrey and Kingsley confirmed that Vanguard took all of the

14 economic risk of the albums' profitability.  Ex. 3 (Kingsley Dep.) at 207:1-7

15 (explaining that Vanguard assumed the economic risk); Ex. 5 (Perrey Dep.) at 36: 24-

16 37:7.  Indeed, Mr. Kingsley testified that the copyright in the composition for

17 "Baroque Hoedown" belongs to Vanguard because it took the economic risk in

18 creating the album by paying for, among other things, the musicians (including Mr.

19 Kingsley, Mr. Perrey, the pianist, the guitarist and others), the studio where the album

20 was created, the manufacturing costs and the distribution costs.  Ex. 3 (Kingsley Dep.)

21 at 206: 6-10.

22         Perrey concurred and explained that Vanguard assumed all of the

23 financial risk of having the albums made.  Ex. 5 (Perrey Dep.) at 35:14-19 ("Q. So

24 Vanguard employed and paid for all of the musicians that recorded this album

25 including you and Mr. Kingsley, correct? [objection] A. Yes.") & 36: 24-37:7.

26 Neither Kingsley nor Perrey risked any of their own money in connection with these

27 albums.  Ex. 3 (Kingsley Dep.) at 321:25-322:15; Ex. 5 (Perrey Dep.) at 34:23-35:3.

28         Based on the foregoing, it is clear that Vanguard assumed all of the

economic risk of having the albums made.  It follows that this prong of the "instance

15

1   and expense test" also is satisfied.   *Entm't Distrib.*, 429 F.3d at 881; *Siegel*, 2009 WL

2   2512842, at *17.

3   **2.      The 1966 and 1968 Agreements are Typical Work For Hire**

4   **Agreements**

5   For reasons set forth above, the relationship between Vanguard, on the

6   one hand, and Perrey and Kingsley, on the other, establishes that the Compositions

7   were works made for hire.  Lest the Court have any reservations about the

8   relationship, however, it is significant to note that the language of the 1966 and 1968

9   Agreements is *nearly identical* to the form "exclusive songwriter agreement" set forth

10  in Section 30.02 of the *Nimmer on Copyright* treatise.  Ruga Decl., Ex. 7 at pp. 3-12.

11  Nimmer explains that an "exclusive songwriter agreement" is one "in

12  which the publisher owns the entire copyright and typically administers the copyright

13  with greater freedom from any approvals or controls imposed by the writer."  Ex. 7 at

14  p. 2.  Here, Mr. Perrey confirmed at his deposition that, under both the 1966 and 1968

15  Agreements, Perrey and Kingsley (and subsequently just Perrey) were hired to create

16  the songs, and Vanguard owned the entire copyright in the Compositions and

17  administered the copyright with *no* approvals or controls imposed by Mr. Perrey (or

18  Mr. Kingsley).  Ex. 5 (Perrey Dep.) at 55:5-10 ("Q. You never controlled or imposed

19  any conditions on Fenario [Vanguard's publishing company],[13] correct? [objection] A.

20  No, I didn't control anything because at the time I understood nothing about this.).[14]

21  In fact, when one compares the form "exclusive songwriting agreement" in Section

22  30.02 of *Nimmer* to the 1966 and 1968 Agreements, the terms are *nearly identical*.

23  (*Compare* Ex. 7 at pp. 3-12 *with* Exs. 1 & 2).

24  Significantly, *Nimmer* confirms that the compositions created under an

25  exclusive songwriter agreement are done on a work for hire basis:

26  _____

[13] Fennario is the publishing arm of Vanguard.

27

28  [14] Moreover, the language of the Agreements makes clear that the purpose of them was to furnish
    Vanguard with original compositions.  *See* Ex. 1 ¶ 16 ("You will furnish us with original
    compositions."); Ex. 2 ¶ 24 (same).

> In an exclusive songwriter agreement, the publisher owns the entire copyright of the musical composition(s) in perpetuity. The writer typically renders services exclusively for the publisher **on a 'work for hire' basis** for a period of time (often one year with several one-year extensions exercisable at the publisher's sole discretion) and the publisher is the copyright owner.

Ex. 7 at pp. 2-3 (emphasis added) (endnote omitted). Because the relevant provisions of the 1966 and 1968 Agreements are akin to typical exclusive songwriter agreements, it follows that the work done by Messrs. Kingsley and Perrey under those agreements was on a work for hire basis. *Id.*

### B. Plaintiffs Also Lack Standing to Assert Their Copyright Infringement Claims Because None of the Plaintiffs "Fixed" the Compositions in a "Tangible Medium of Expression"

It is axiomatic that the Copyright Act protects only those works that are fixed in a tangible medium of expression. 17 U.S.C. § 102(a) ("Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression. . . ."); *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (explaining that the author of a work is "the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection."). To successfully bring a claim for copyright infringement, *each* putative joint author must have made a contribution to the work that was independently copyrightable. *Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 1999) (noting that coaching actors is does not result in a copyrightable contribution). Here, Plaintiffs lack standing to assert their copyright infringement claims because none of the Plaintiffs "fixed" the Compositions in a "tangible medium of expression."

Because Plaintiffs have alleged infringement of the underlying musical compositions (*see, e.g.*, Compl. ¶¶ 20, 22, 23), they must demonstrate that each made a contribution to the *composition* that was independently copyrightable – *i.e.*, fixed in a tangible medium. *See Newton v. Diamond*, 204 F. Supp. 2d 1244, 1249 (C.D. Cal. 2002) (noting that a copyrighted song on a phonorecord has two separate copyrights,

17

1    one for the musical composition and the other for the sound recording and explaining

2    that "[t]he rights of a copyright in a sound recording do not extend to the song itself,

3    and *vice versa*).  Accordingly, the court must first discern what (if any) elements of a

4    plaintiff's work are protected by the copyright in the musical composition, as opposed

5    to those protected in the sound recording, and "filter out" the latter.  *Id.*  The court in

6    *BTE v. Bonnecaze*, 43 F. Supp. 2d 619 (E.D. La. 1999), cited for support in *Newton*,

7    encountered a similar factual scenario of determining the difference between "fixing"

8    a composition versus "fixing" a sound recording.

9           In *BTE*, the plaintiff was a former drummer for the rock band "Better

10   Than Ezra" who claimed copyright ownership in certain compositions for songs

11   created by the band.  *BTE*, 43 F. Supp. 2d at 621.  The plaintiff claimed that he

12   "presented valuable contributions" to the band in "working up" the songs that

13   eventually were fixed in a tangible form of expression when the band (including

14   plaintiff) recorded the songs.  *Id.* at 627.  The court concluded that, while the plaintiff

15   clearly has a copyright in the *sound recordings*, he has no copyright in the

16   *compositions* because he failed to produce any evidence that his contributions to the

17   compositions were fixed in a tangible form of expression.  *Id.*  The court aptly noted

18   that the "sound recordings of the songs cannot serve as the tangible form" of the

19   underlying compositions.  *Id.* at 628.

20          As in *BTE*, here, each of the Compositions was "fixed" in the form of

21   "lead sheets" that were registered with the United States Copyright Office.  *See*

22   Compl. ¶ 22.[15]  These lead sheets are 1-3 pages each and contain the written musical

23   notes that comprise the basic melody of each song.

24

25   ───────────────────

     [15] Under the 1909 Copyright Act, materials had to bear a valid copyright notice upon publication in

26   order to be afforded copyright protection; otherwise, the material simply fell into the public domain.
     *See, e.g.*, *Twin Books Corp. v. Walt Disney Co.*, 83 F.3d 1162, 1165-66 (9th Cir. 1996).  Here, the

27   lead sheets are the only materials that were registered with the Copyright Office and have a valid
     copyright notice.  It follows that Plaintiffs' infringement claim must be based solely on the lead

28   sheets because anything else that was created but not validly noticed has fallen into the public
     domain.

                                              18

1    As explained below, however, none of the Plaintiffs was responsible for

2  creating these lead sheets.  Accordingly, the Plaintiffs were not responsible for fixing

3  the Compositions in a tangible medium of expression and therefore have no standing

4  to assert their infringement claim.

5         **1.    Jean-Jacques Perrey**

6         Mr. Perrey admitted unequivocally that he was not responsible for

7  creating the lead sheets because *Mr. Perrey cannot read or write music*.  Ex. 5 (Perrey

8  Dep.) at 84:5-7 ("Q. Now, you told me before that you cannot write down music,

9  right? A. Yes, that is the problem."); Ex. 6 (Perrey Dep.) at 56:9 ("I am incapable of

10  reading music.").  Mr. Perrey further admitted that he never fixed the notes for any of

11  the Compositions in any tangible medium of expression—they were only fixed in Mr.

12  Perrey's brain, or "neurons."  Ex. 6 (Perrey Dep.) at 95:6-16 ("Q:  It is true that you

13  never wrote down or fixed in any medium any of the notes for "Baroque Hoedown,"

14  "Country Rock Polka" or "An Elephant Never Forgets," correct? [objection]  A:  I

15  didn't write them down.  I didn't write anything for that.  I recorded it in my

16  neurons.").  Mr. Perrey testified that he has no idea who was responsible for creating

17  the lead sheets that were registered with the Copyright Office.  *See* Ex. 6 (Perrey

18  Dep.) at 54:15-25 & 78:14-79:2 & 82:4-16 & 87:6-20.  Simply put, Mr. Perrey—like

19  the plaintiff in *BTE*—has no copyright in the Compositions because he was not

20  responsible for creating the lead sheets or otherwise fixing the Compositions in a

21  tangible medium of expression, regardless of his creative input to the sound recording.

22  *Cf. SOS, Inc. v. Payday, Inc.,* 886 F.2d 1081, 1086 (9th Cir. 1989) (rejecting the

23  finding of joint authorship where alleged owner did none of the computer

24  programming and did not read or understand computer language).

25         **2.    Gershon Kingsley**

26         Mr. Kingsley claims to have an interest in the composition for "Baroque

27  Hoedown."  Compl. ¶ 17.  Yet, at his deposition, Mr. Kingsley admitted that he never

28  before had seen the lead sheets for "Baroque Hoedown," he did not know who created

1   them or when they were created.  Ex. 3 (Kingsley Dep.) at 472:15-25 & 473:8-14 &

2   475:5-10.  It follows that he was not the person responsible for creating the lead sheets

3   recorded with the Copyright Office and therefore lacks standing to assert infringement

4   of the composition for "Baroque Hoedown."  *BTE*, 43 F. Supp. 2d at 628.

### 3.   Fernand Bouillon

6           The Complaint alleges that the deceased Mr. Bouillon (plaintiff

7   Meunier's father) was a co-composer of the musical composition "Country Rock

8   Polka."  Compl., ¶¶19, 21.  Perrey, however, testified at his deposition that Mr.

9   Bouillon's *sole* contribution to "Country Rock Polka" was that he gave Perrey the

10  *idea* for the song.  Ex. 4 (Perrey Dep.) at 84:17-19 ("Q:  And did Mr. [Bouillon]

11  compose any part of Country Rock Polka?  A: No but he gave me the idea."); Ex. 6

12  (Perrey Dep.) at 21:21-22:10 ("Q….what did [Mr. Bouillon] contribute to these

13  albums that you created for Vanguard? A. He gave me the sort of foundations for a

14  tune… Q. Did [Mr. Bouillon] write it down for you or give you any sort of medium in

15  any way? A. No.").[16]  Because Mr. Bouillon is not entitled to any copyright protection

16  for his *idea* of creating "Country Rock Polka," neither he nor his heirs have standing

17  to assert infringement of the composition.  *See, e.g.*, *SOS*, 886 F.2d at 1087 ("To be an

18  author, one must supply more than mere direction or ideas.").

### 4.   Harry Breuer

20          The Complaint alleges that Mr. Breuer was a co-composer for the

21  compositions "An Elephant Never Forgets" and "Country Rock Polka."  Compl., ¶¶

22  18-19.

23

24

---

25  [16] Mr. Bouillon was Mr. Perrey's friend and, out of gratitude for the idea, Mr. Perrey credited Mr.
    Bouillon as a co-composer on the song.  Ex. 6 (Perrey Dep.) at 23:10-15 ("Q:  Did you agree to give
26  Mr. Bouillon credit for his contribution into 'Country Rock Polka?'  Did you say that to him?
    [objection]  A: No, I wanted it to be a surprise for him, in recognition of his help.").  This factor also
27  supports the finding Bouillon did not *intend* to be a co-owner of the Composition, another requisite
    for finding co-ownership. *See, e.g.*, *Erickson v. Trinity Theater, Inc*., 13 F.3d 1061, 1072 (7th Cir.
28  1994) (rejecting the finding that actors were co-owners of work, for various reasons, including that
    they did not consider themselves joint authors with Erickson).

1    It is undisputed that "An Elephant Never Forgets" is a derivative of

2  Beethoven's "Turkish March."  According to Mr. Perrey, "An Elephant Never

3  Forgets" is comprised of a main theme (or "first part"), a second part, and a third part.

4  Ex. 6 (Perrey Dep.) at 44:22-45:6.  Mr. Breuer had no involvement in the first or

5  second parts of the song.  *Id.* at 44: 24-45:3.  Mr. Breuer gave Mr. Perrey the *idea* for

6  the third part of the song but that idea was subsequently "developed" and changed by

7  Mr. Perrey before the final version of the song was recorded.  Ex. 6 (Perrey Dep.) at

8  45:19-46:7 (Q. "You said how you had…composed "An Elephant Never Forgets" and

9  then Mr. Breuer in the studio had an idea about changing some parts of it and you and

10  Mr. Breuer worked on it together to change some parts of "An "Elephant Never

11  Forgets."  Is that what you are saying? [objection] A. No, the third part, for the third

12  part of it  I didn't have any ideas and I asked Mr. Harry Breuer to suggest something

13  to me.  He did so.  And I took part of that idea and I completed it afterwards and

14  finished it.").

15    Furthermore, the actual lead sheet for "An Elephant Never Forgets" that

16  was recorded with the Copyright Office contains nothing more than the basic melody

17  from Beethoven's "Turkish March" – it does not contain any of the allegedly unique

18  elements added by Plaintiffs.  Ex. 6 (Perrey Dep.) at 76:24-77:4 ("Q: So what you

19  added to Beethoven's Turkish March does not appear on Exhibit 245 [the lead sheet

20  for An Elephant Never Forgets deposited with the Copyright Office], correct?

21  [objection]  A: It doesn't appear.").  It cannot, therefore, be the subject of copyright

22  protection here.  *See Newton*, 204 F. Supp. 2d at 1256 (rejecting infringement claim

23  where, "after filtering out the performance elements [*i.e.*, elements that are heard in

24  the sound recording but not written in the composition]," the court was left with an

25  unoriginal portion that could not be protected by copyright).  Moreover, because the

26  lead sheet merely contains the basic melody of Beethoven's *Turkish March*, Mr.

27  Perrey does not believe that Mr. Breuer created it.  Ex. 6 (Perrey Dep.) at 78:16-20

28  ("Q: . . . [D]o you believe that Mr. Breuer would have written down this exhibit

21

number 245?  [objection]  A:  I don't think so.").  It follows that Mr. Breuer did not make any copyrightable contributions to the composition for "An Elephant Never Forgets."  *Newton*, 204 F. Supp. 2d at 1251 (finding that where plaintiff's music techniques do no not appear in the musical composition, they can be protected only by the sound recording copyright and cannot support a claim for infringement of the composition).

Nor is there any evidence that Mr. Breuer made any copyrightable contributions to the composition for "Country Rock Polka."  In fact, Mr. Perrey testified that he has "no evidence whatsoever" to believe that Mr. Breuer was responsible for creating the lead sheet for "Country Rock Polka."  Ex. 6 (Perrey Dep.) at 82:12-16 ("Q:  . . . [D]o you have any evidence whatsoever to believe that it was Mr. Breuer who wrote this [the lead sheet for "Country Rock Polka"] down?  [objection]  A:  No.").  Mr. Breuer's heirs similarly admitted in their discovery responses that they have no evidence of Mr. Breuer's alleged participation in creating the Compositions.  Accordingly, Plaintiffs cannot satisfy their burden of demonstrating that Mr. Breuer has standing to pursue the copyright infringement claims.  *See, e.g.*, *SOS, Inc.,* 886 F.2d at 1085 (explaining that *plaintiff* has the burden of proving copyright authorship).

## C.   Plaintiffs Lack Standing to Assert Their Breach of Contract Claim

Plaintiffs' third cause of action is against Univision for alleged breach of a license agreement between Univision and ASCAP; Plaintiffs are not parties to that agreement.  Compl., ¶¶ 46-53.  Plaintiffs acknowledge that ASCAP issued a blanket license to Univision that allows Univision to broadcast recordings of the compositions in ASCAP's repertory, including the Compositions at issue in this case.  Compl.,¶ 46.[17]  Plaintiffs then assert "on information and belief" the ASCAP license "required

---

[17] In fact, there are two license agreements that were signed during the relevant limitations period. The term of the first agreement was from January 1, 2003 to December 31, 2007; the term of the second is from January 1, 2008 to December 31, 2013.  (Ruga Decl., Exs. 8 and 9.)  The relevant language from each agreement, however, is nearly identical.

1    that Univision accurately report the titles and authors of the compositions performed

2    in programs broadcast on its network."  Compl., ¶ 47.  Plaintiffs allege that Univision

3    failed to comply with this requirement and Plaintiffs have standing to assert the breach

4    as *third-party beneficiaries* of the ASCAP/Univision license.  *Id.*

5         Plaintiffs, however, are mistaken about both the substance and effect of

6    the ASCAP/Univision license.  Substantively, the ASCAP/Univision license does not

7    impose any affirmative obligation on Univision to provide cue sheets to ASCAP.

8    Instead, the license agreement states that, "*upon ASCAP's reasonable request*,"

9    Univision shall report to ASCAP all uses of music furnished by Univision to its

10   affiliates.  Ruga Decl., Exs. 8 & 9 at p. ¶ 5(A) (emphasis added)).  Therefore, contrary

11   to Plaintiffs' allegation, Univision was not "required" to provide this information

12   absent a specific request from ASCAP.  Plaintiffs have not alleged any such request

13   by ASCAP and, therefore, their claim is inadequately pled.

14        Moreover, Plaintiffs are mistaken that they are third-party beneficiaries

15   of the agreement.  New York law[18] "requires that the parties' intent to benefit a third-

16   party be shown on the face of the contract."  *Abu Dhabi Commercial Bank v. Morgan*

17   *Stanley & Co. Inc.*, ___ F. Supp. 2d ___, 2009 WL 2828018, at *17 (S.D.N.Y. Sept. 2,

18   2009).  Plaintiffs here allege that they are third-party beneficiaries because the

19   supposed provision in the contract obligating Univision to provide accurate cue sheets

20   "was for the benefit of those authors because it enabled ASCAP to calculate and pay

21   the performance royalties due them on account of the licensed performances of their

22   compositions."  Compl., ¶ 47.  Again, Plaintiffs' allegation misses the mark because

23   the Univision/ASCAP license agreement does not affirmatively require Univision to

24   provide cue sheets.

25

26

27   [18] The ASCAP/Univision license agreement contains a New York choice of law provision.  (Ruga Decl., Ex. 8 at ¶ 18; Ex. 9 at ¶ 19.)  California law is the same.  *See* Cal. Civ. Code § 1559 ("A

28   contract, made *expressly for the benefit of a third person*, may be enforced by him at any time before the parties thereto rescind it.") (emphasis added).

23

1    But even if Plaintiffs ultimately do receive some benefit from the

2    Univision/ASCAP license, this cannot be the basis of conferring third-party

3    beneficiary status on Plaintiffs because this purported "benefit" is not expressed

4    anywhere on the face of the Univision/ASCAP license agreement as required by New

5    York law. *Abu Dhabi Commercial Bank*, ___ F. Supp. 2d ___, 2009 WL 2828018, at

6    *17.  Plaintiffs cannot satisfy their burden of demonstrating otherwise.

7    Furthermore, the ASCAP Membership Agreement confirms that *only*

8    *ASCAP* has standing to enforce the terms of its license agreements.  Ruga Decl., Ex.

9    10 at ¶¶ 4-5.  The ASCAP Membership Agreement is the agreement which transfers

10    the public performance right from the copyright holders to ASCAP and allows

11    ASCAP to license music to third-parties.  *See id.* at ¶ 1.  In exchange, ASCAP agrees

12    to pay the copyright holders a percentage of royalties collected from the license

13    agreements.  *Id.* at ¶ 3.  The Membership Agreement is clear, however, that only

14    ASCAP has standing to assert a claim against the third-party licensees (here,

15    Univision).  *Id.* at ¶ 4 ("The *Owner* hereby irrevocably . . . authorizes, empowers and

16    *vests in the Society* the right to enforce and protect such rights of public performance

17    under any and all copyrights . . . to litigate, collect and receipt for damages arising

18    from infringement . . . to bring suit in the name of *Owner* and/or in the name of the

19    *Society* . . . .") (emphasis added); *id.* ¶ 5 ("The *Owner* hereby makes, constitutes and

20    appoints the *Society* . . . the *Owner's* true and lawful attorney . . . to restrain

21    infringements and recover damages in respect to or for the infringement or other

22    violation of the rights of public performance in such works . . . .").

23    For each of these reasons, Plaintiffs are not third-party beneficiaries of

24    the ASCAP/Univision license agreement and therefore lack standing to assert their

25    claim for breach of contract. *See Monahan v. Pena*, 2009 WL 2579085, at *3

26    (E.D.N.Y. Aug. 18, 2009) (concluding that the plaintiff lacked standing to sue for

27    breach of contract because "Plaintiff is plainly not a party to that contractual

28    agreement, and not an intended third-party beneficiary.").

24

1

# V.        CONCLUSION

2
        Plaintiffs are not the beneficial owners of the copyrights in the

3
Compositions and lack standing to sue for infringement because the Compositions

4
were created at the instance of expense of Vanguard and therefore were works made

5
for hire.  Furthermore, even if the Compositions were not works made for hire,

6
Plaintiffs still lack standing to sue for copyright infringement because none of them

7
"fixed" the Compositions in a "tangible medium of expression."  Finally, Plaintiffs

8
have no standing to assert their breach of contract claims because they are neither

9
parties to, nor third-party beneficiaries of, the ASCAP/Univision license agreement

10
that allegedly was breached.  For each of these reasons, Defendants respectfully

11
request that the Court dismiss Plaintiffs' Complaint.

12

13
Dated:  November 30, 2009                STEPTOE & JOHNSON LLP

14

15
                                         By:   /s/ Dylan Ruga

16
                                              Dylan Ruga
                                              Attorneys for Defendants

17
                                              Univision Communications, Inc.
                                              and Galavision, Inc.

18

19
Dated:  November 30, 2009                SIDLEY AUSTIN LLP

20

21
                                         By:   /s/ Stephen G. Contopulos

22
                                              Stephen G. Contopulos
                                              Attorneys for Defendants

23
                                              Xenon Pictures, Inc.
                                              and LionsGate Entertainment, Inc.

24

25

26

27

28

25